**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
KAREN ANTLE,                      )
                                  )
                  Plaintiff,      )
                                  )
        v.                        )       1:21CV561
                                  )
KILOLO KIJAKAZI,                  )
Acting Commissioner of Social     )
Security,                         )
                                  )
                  Defendant.¹     )
```

<u>**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**</u>

Plaintiff, Karen Antle, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claims for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 11 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 13, 16; <u>see also</u> Docket Entry 14 (Plaintiff's Memorandum); Docket Entry 17 (Defendant's Memorandum); Docket Entry 19 (Plaintiff's Reply)). For the reasons that follow, the Court should remand this matter for further administrative proceedings.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 320-23), alleging a disability onset date of October 24, 2003 (see Tr. 320).[2] Upon denial of that application initially (Tr. 107-19, 159-62) and on reconsideration (Tr. 120-35, 167-74), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 175-76). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 34-66.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 136-50.) The Appeals Council thereafter granted Plaintiff's request for review (Tr. 155-58, 228-37), remanding the case for the ALJ to "[g]ive further consideration to the treating and nontreating source opinions . . . and nonexamining source opinions . . . and explain the weight given to such opinion evidence" (Tr. 156). Following the Appeals Council's remand order, the ALJ convened a hearing (Tr. 67-92) and a supplemental hearing (Tr. 93-106), which Plaintiff's attorney and VEs attended (see Tr. 67, 93). The ALJ again ruled that Plaintiff failed to meet the requirements for disability under the Act (Tr. 10-27), and the Appeals Council denied Plaintiff's request for review (Tr. 1-7, 316-19; see also Docket Entry 14-1),[3]

---

[2] Plaintiff subsequently amended her alleged onset date several times due to earnings from work activity that rose to the level of substantial gainful activity (see Tr. 338, 396), and ultimately chose January 1, 2016, as her onset date (see Tr. 339, 528).

[3] Plaintiff attached her request for review to her Memorandum in support of her instant motion because the record did not contain a copy of that document. (See Docket Entry 14 at 2 n.1.)

2

thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1.  [Plaintiff] meets the insured status requirements of the [] Act through December 31, 2024.

. . .

2.  [Plaintiff] has not engaged in substantial gainful activity since January 1, 2016, the amended alleged onset date.

. . .

3.  [Plaintiff] has the following severe impairments: fibromyalgia, rheumatoid arthritis, and degenerative disc disease of the cervical spine.

. . .

4.  [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.  . . . [Plaintiff] has the residual functional capacity to perform medium work . . . except she can: frequently climb ladders, ropes, or scaffolds; frequently stoop, crouch, kneel, and crawl; frequently reach overhead with both arms; and frequently handle and finger objects with both hands.

. . .

6.  [Plaintiff] is capable of performing past relevant work as a telemarketer ([Dictionary of Occupational Titles ("DOT")] #299.357-014). This work did not require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity.

. . .

3

7.    [Plaintiff] has not been under a disability, as
defined in the . . . Act, from the amended onset date of
January 1, 2016, through the date of this decision.

(Tr. 15-27 (bold font and internal parenthetical citations
omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits." Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope
of [the Court's] review of [such a] decision . . . is extremely
limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).
Even given those limitations, the Court should remand this case for
further administrative proceedings.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead,
the Court "must uphold the factual findings of the ALJ if they are
supported by substantial evidence and were reached through
application of the correct legal standard." Hines, 453 F.3d at 561
(internal brackets and quotation marks omitted). "Substantial
evidence means 'such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion.'" Hunter v. Sullivan,
993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402
U.S. 389, 401 (1971)). "It consists of more than a mere scintilla
of evidence but may be somewhat less than a preponderance." Mastro

4

v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

5

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[4] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[5] A finding adverse to the

---

[4] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[5] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the
(continued...)

claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[6] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to

[5] (...continued)
[Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[6] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[7]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ failed to evaluate properly the opinion evidence" (Docket Entry 14 at 6 (bold font and capitalization omitted); <u>see also</u> Docket Entry 19 at 1-5);

2) "[t]he ALJ erred in finding that [Plaintiff] has no mental limitations" (Docket Entry 14 at 15 (bold font and capitalization omitted); <u>see also</u> Docket Entry 19 at 10);

---

[7] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. <u>See, e.g.,</u> <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

3) "[t]he ALJ erred in requiring objective evidence to substantiate [Plaintiff]'s claims" (Docket Entry 14 at 17 (bold font, capitalization, and single-spacing omitted));

4) "[t]he ALJ mischaracterized the evidence and cherry-picked from the record" (id. at 20 (bold font, capitalization, and single-spacing omitted); see also Docket Entry 19 at 7-9); and

5) "[t]he ALJ failed to give proper consideration to non-medical evidence in the record" (Docket Entry 14 at 21 (bold font, capitalization, and single-spacing omitted); see also Docket Entry 19 at 10-11).

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (Docket Entry 17 at 6-20.)

## 1. Opinion Evidence

Plaintiff's first issue on review contends that "[t]he ALJ failed to evaluate properly the opinion evidence."  (Docket Entry 14 at 6 (bold font and capitalization omitted); see also Docket Entry 19 at 1-5.)  In particular, Plaintiff maintains that the ALJ failed to give sufficient explanations for the weight she afforded to the opinions of 1) the state agency medical consultants (see Docket Entry 14 at 7-8; see also Docket Entry 19 at 2-4), 2) treating providers Dr. Carol Klein and Rebecca Kooistra, FNP ("Nurse Kooistra") (see Docket Entry 14 at 9-12; see also Docket Entry 19 at 4-5), 3) consultative psychological examiner Dr. Vincent J. Maginn (see Docket Entry 14 at 12-13), and 4) the state

9

agency psychological consultants (see id. at 13-15). According to Plaintiff, "[i]f the RFC assessment is in conflict with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted" (id. at 7 (citing Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *7 (July 2, 1996) ("SSR 96-8p"))), and "must build a 'logical bridge' between h[er] conclusion and the evidence presented" (id. (quoting Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018))). Plaintiff's contentions regarding the ALJ's evaluation of the opinions of the state agency medical consultants, Dr. Klein, and Nurse Kooistra have merit and warrant remand.

The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. 20 C.F.R. § 404.1527(c)(2) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").[8]  The rule also

---

[8] For claims filed on or after March 27, 2017, the Commissioner has significantly amended the regulations governing opinion evidence.  The new regulations provide that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."  20 C.F.R. § 404.1520c.
(continued...)

recognizes, however, that not all treating sources or treating source opinions merit the same deference. The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion. <u>See</u> 20 C.F.R. § 404.1527(c)(2)(ii). Moreover, as subsections (2) through (4) of the rule detail, a treating source's opinion, like all medical opinions, deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence of record. <u>See</u> 20 C.F.R. § 404.1527(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." <u>Craig</u>, 76 F.3d at 590 (emphasis added).

Although, as a general matter, opinions from an examining source warrant more weight than those from a non-examining source such as state agency consultants, <u>see</u> 20 C.F.R. 404.1527(c)(1), non-examining state agency consultants constitute "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation[,]" 20 C.F.R. § 404.1527(e)(2)(i), and ALJs must weigh opinions from non-examining state agency consultants using the same factors the ALJs use to weigh any other medical opinions, <u>see</u> 20 C.F.R. § 404.1527(e)(2)(ii), which include the consistency and

<hr>

[8] (...continued)
As Plaintiff filed her claim for DIB prior to March 27, 2017 (<u>see</u> Tr. 320-23), this Recommendation has analyzed Plaintiff's opinion evidence contentions pursuant to the rules governing opinion evidence set out above.

supportability of the opinions, see 20 C.F.R. § 404.1527(c)(3), (4). Moreover, an ALJ can permissibly credit the opinions of a non-examining state agency consultant, who typically offers opinions without the benefit of a full record, over those of even a treating physician, to the extent the non-examining source's opinions remain consistent with the evidence received subsequent to his or her opinions. See Lapeer v. Astrue, No. 5:08CV256, 2009 WL 2487038, at *7 (E.D.N.C. Aug. 13, 2009) (unpublished).

a. State Agency Medical Consultants

Plaintiff first points out that the ALJ accorded "'great weight'" to the opinions of the initial-level state agency medical consultant (id. (quoting Tr. 24)), who opined that Plaintiff could perform medium work, i.e., could lift and carry up to 50 pounds occasionally and up to 25 pounds frequently, and could sit, stand, and walk each for up to six hours in an eight-hour workday (see Tr. 114-15), because the ALJ found those opinions "'well-supported by the treatment notes of Dr. Klein and [Plaintiff]'s primary care physician, as well as the evaluation performed by [consultative medical examiner] Dr. [Mike] Dearinger, and . . . consistent with the conclusions of [Plaintiff]'s treating physicians'" (id. at 7-8 (quoting Tr. 24)). Plaintiff contests that rationale, because Dr. Klein and Nurse Kooistra "detailed limitations that accord with a-less-than-sedentary RFC" (id. at 8 (citing Tr. 600-05, 672-76); see also Docket Entry 19 at 3), "[t]heir treatment notes also document

12

limitations clearly at odds with medium exertion" (Docket Entry 14 at 8; see also Docket Entry 19 at 3), and "Dr. Dearinger's clinical findings are inconsistent with an ability to perform the considerable standing and lifting required in medium work" (Docket Entry 14 at 8 (citing Tr. 597 as "document[ing] pain when testing range of motion of [Plaintiff's] wrists, fingers, and knees as well as tenderness over many muscles of her back"); see also Docket Entry 19 at 3 (quoting Tr. 597 as "f[inding] only that [Plaintiff] was able to 'lift, carry, and handle light objects'" and "that she could 'rise from a sitting position without assistance' and stand on her heels" (emphasis supplied by Plaintiff))).

By way of further example, Plaintiff notes that, although "[t]he ALJ failed to state what weight she was giving th[e] opinion [of the reconsideration-level state agency medical consultant that Plaintiff could perform light work]" (id. (citing Tr. 129)), the ALJ's remark that the consultant's opinion "'[was] not consistent with the findings of [Plaintiff]'s treating physicians and fail[ed] to adequately take into account [Plaintiff]'s own allegations'" (id. (quoting Tr. 24)) "actually suggests that [the ALJ] th[ought the consultant's opinion wa]s an overestimate of [Plaintiff]'s abilities" (id.; see also Docket Entry 19 at 2-3). Plaintiff maintains that, although "[t]he Appeals Council vacated the ALJ's previous decision because the hearing decision did not contain an adequate evaluation [of the reconsideration-level consultant's]

13

opinions" (Docket Entry 14 at 7 (citing Tr. 156-57)), "[t]he ALJ's decision after remand failed to rectify this error[, as] her discussion of these opinions (Tr. 24) is the same as that found in the prior decision (Tr. 147-48)" (id.). Plaintiff's contentions have merit and warrant remand.

The ALJ provided the following analysis of the state agency medical consultants' opinions:

> Although the medical consultants did not find that sufficient evidence existed to evaluate the period from January 1, 2015 to February 17, 2017, the [ALJ] nonetheless gives great weight to the opinions of [the initial-level consultant] with respect to [Plaintiff]'s physical limitations, including medium exertion, frequent stooping and crouching, and frequent bilateral handling and fingering. The conclusions are well-supported by the treatment notes of Dr. Klein and [Plaintiff]'s primary care physician, as well as the evaluation performed by Dr. Dearinger, and they are consistent with the conclusions of [Plaintiff]'s treating physicians. Great weight is given to [the reconsideration-level consultant's] conclusions with regard to [Plaintiff]'s manipulative limitations and her ability to climb, balance, kneel, and crawl, as they are well-supported by the treatment records and are generally consistent with the overall medical evidence of record. However, her limitations of [Plaintiff] to light exertion work and failure to include limitations to stooping and crouching are not consistent with the findings of [Plaintiff]'s treating physicians and fail to adequately take into account [Plaintiff]'s own allegations.

(Tr. 24 (emphasis added).) The ALJ's above-quoted analysis frustrates meaningful judicial review by this Court in three respects, requiring remand.

First, all three of the ALJ's grounds for affording great weight to the initial-level consultant's opinions lack validity.

14

The ALJ erred by finding that the initial-level consultant's opinions that Plaintiff remained capable of medium exertion work "[we]re consistent with the conclusions of [Plaintiff]'s treating physicians." (Id.) The ALJ identified neither the "conclusions" nor the "treating physicians" to which she referred, and failed to provide any citations to the record to assist the Court in following her reasoning. If, by "conclusions of [Plaintiff]'s treating physicians" (id.), the ALJ referred to the functional capacity forms completed by Dr. Klein and Nurse Kooistra (Tr. 600-04, 672-76) which, inter alia, each restricted Plaintiff to less-than-sedentary exertion (see Tr. 601, 673), opined that she could handle and finger only for up to 30 minutes in an eight-hour workday (see Tr. 602, 674), and predicted that she would remain off-task for more than 25 percent and 15 percent of a workday, respectively (see Tr. 603, 675), as well as miss work more than four days per month (see Tr. 603, 675), then the ALJ's analysis makes no sense. The initial-level consultant's opinion that Plaintiff could perform medium-exertion work with frequent handling, fingering, stooping, and crouching without allowances for time off-task of absence does not harmonize at all with the opinions on the functional capacity forms. (Compare Tr. 114-15, with Tr. 600-04, 672-76.) If the ALJ intended the phrase "conclusions of [Plaintiff]'s treating physicians" to refer to something other than the functional capacity forms completed by Dr.

15

Klein and Nurse Kooistra, then the ALJ's rationale does not sufficiently permit judicial review. None of Plaintiff's other treating physicians submitted opinions regarding her functional capacity, and the ALJ's earlier statement that the initial-level consultant's opinions "[we]re well-supported by the treatment notes of Dr. Klein and [Plaintiff]'s primary care physician" (Tr. 24 (emphasis added)) would strongly suggest the ALJ did not intend "conclusions of [Plaintiff]'s treating physicians" (id. (emphasis added)) to refer to findings in the treatment notes of Dr. Klein and Nurse Kooistra.

Plaintiff's challenge to the ALJ's finding that the clinical findings of Dr. Dearinger supported the initial-level consultant's medium-exertion opinions also has merit. (See Docket Entry 14 at 8 (citing Tr. 24).) In support of that argument, Plaintiff emphasizes that Dr. Dearinger "document[ed] pain when testing range of motion of [Plaintiff's] wrists, fingers, and knees as well as tenderness over many muscles of her back" (id. (citing Tr. 597)) as well as "found only that [Plaintiff] was able to 'lift, carry, and handle light objects'" and "that she could 'rise from a sitting position without assistance' and stand on her heels" (Docket Entry 19 at 3 (quoting Tr. 597 (emphasis supplied by Plaintiff))).

The ALJ described Dr. Dearinger's findings as follows:

[Plaintiff] exhibited good coordination and balance and displayed a normal gait without the use of an assistive device. Dr. Dearinger noted normal muscle strength, tone, and bulk, and saw no evidence of muscle spasms.

16

[Plaintiff]'s <u>reflexes were normal</u>, and she exhibited <u>negative results to straight leg raise and sitting slouch tests</u>. Although Dr. Dearinger noted <u>visible joint deformities</u> in both hands with <u>ulnar deviation</u> of the digits, [Plaintiff] was able to lift, carry, and handle <u>light</u> objects. Additionally, [Plaintiff] could squat and rise with ease, rise from a sitting position without assistance, and had no difficulty getting onto or off of the exam table. [Plaintiff] was able to stand on both heels and toes, had a normal tandem stance, and was able to adequately dress and undress herself without assistance. Dr. Dearinger noted that [Plaintiff]'s hands could be fully extended, she was able to make a fist, and her fingers could be opposed. [Plaintiff] was also able to pinch, grasp, and manipulate small and large objects without difficulty.

(Tr. 21 (internal parenthetical citations omitted) (emphasis added).) The ALJ's reliance on Dr. Dearinger's clinical findings does not sufficiently support the ALJ's assignment of great weight to the initial-level state agency medical consultant's medium-exertion opinions.

As emphasized above, the ALJ relied on normal findings with regards to Plaintiff's strength, tone, bulk, reflexes, sensation, and straight leg raise testing (<u>see id.</u>), but Plaintiff did not report weakness, atrophy, paresthesias, or radiculopathy to Dr. Dearinger; rather, she reported fatigue (<u>see</u> Tr. 589) and "constant" pain that "radiate[d] to everywhere" from fibromyalgia, as well as "pain, stiffness and swelling in [her] joints" from rheumatoid arthritis (Tr. 590). Dr. Dearinger's findings, in turn, corroborated Plaintiff's subjective complaints, as he found "visible and palpable joint deformities at the [first carpometacarpal] joint of [Plaintiff's] right hand and also the

17

[second] and [third metacarpophalangeal] joints of her left and right hands, with ulnar deviation of her digits" (Tr. 594), as well as "pain when testing [range of motion] of her wrists, fingers, knees and left ankle" (id.; see also Tr. 595-96 (documenting reduced range of motion in Plaintiff's wrists, thumb, and left ankle)), and "tenderness to palpation over many muscles of her back" (Tr. 597). The ALJ did not mention Dr. Dearinger's findings of painful, reduced range of motion and tenderness in many of Plaintiff's back muscles despite a much closer correlation to Plaintiff's subjective reports than the strength and neurological findings the ALJ discussed. (See Tr. 21.) Moreover, Dr. Dearinger found only that Plaintiff could "lift, carry, and handle light objects" (Tr. 594 (emphasis added)), and did not offer an opinion on how much Plaintiff could lift or how long she could sit, stand, and walk (see Tr. 589-98).

Although Plaintiff also contests the ALJ's finding that "the treatment notes of Dr. Klein and [Plaintiff]'s primary care physician" (Tr. 24) supported the initial-level consultant's medium-exertion opinions (see Docket Entry 14 at 8), Plaintiff failed to provide the Court with any citations to findings in the treatment records of either Dr. Klein or Nurse Kooistra that conflict with the initial-level consultant's opinions (see id. (providing no citations to record evidence); see also Docket Entry 19 at 3 (explaining why records from Dr. Klein and Nurse Kooistra

18

relied on by the Commissioner do not support medium RFC (citing Docket Entry 17 at 8 (in turn citing Tr. 625, 628, 914, 920)), but not providing citations to records which conflict with medium RFC)). Nevertheless, a review of the ALJ's discussion of treatment records from Dr. Klein and Nurse Kooistra fails to reveal findings that support a medium-exertion RFC. (See Tr. 20-23.)

As an initial matter, the majority of those records consist almost entirely of Plaintiff's subjective symptom reporting and prescribed treatment, and do not contain objective findings beyond Plaintiff's vital signs and the observations that she appeared well-developed, well-nourished, and in no acute distress. (See Tr. 606-71, 677-708, 912-84, 1002-05.) Beyond the lack of objective findings, the ALJ offered generalized observations about those records that did not accurately capture Plaintiff's consistent reports of pain and fatigue:

- the ALJ stated that, "[t]hroughout the remainder of 2016, [Plaintiff] continued treatment with Dr. Klein, and acknowledged some improvement in her symptoms with medication, exercise, and dietary adjustments" (Tr. 20 (citing Tr. 624-25, 627-28)), but those notes actually reflect that Plaintiff reported having "a rough fall" (Tr. 625), and that, although her arthritis symptoms had improved on prednisone, her fibromyalgia symptoms remained the same and that she had "hell days" once per week (Tr. 628);

- the ALJ additionally remarked that, "[t]hroughout the remainder of 2017, [Plaintiff] presented periodically to [Dr. Klein] complaining of pain, fatigue, and trouble sitting and standing[; h]owever during this same period, [Plaintiff] . . . noted that she had pain relief

19

with medication" (Tr. 21 (citing Tr. 609, 615, 617)), as well as that "[t]his trend continued throughout 2018, with [Plaintiff] continuing to describe pain related to fibromyalgia while also endorsing pain relief from gabapentin, [F]lexeril, and [O]xycodone" (id. (citing Tr. 659, 668)), but those records document that Plaintiff appeared "tired" and had "a little difficulty rising from [a] chair" (Tr. 609), that, although Plaintiff reported finding Skelaxin "helpful," she also stated that she "liv[ed] in bed" and "only spen[t] 20-30 min[utes] out of bed[ per] day most of the time" (Tr. 615), and that, although Plaintiff stated that gabapentin "generally" helped her fibromyalgia pain, she characterized that day as a "bad day" (Tr. 668);

- the ALJ further observed that "[Plaintiff] continued to have unremarkable physical . . . findings at her primary care appointments throughout the summer of 2019" (Tr. 22 (citing Tr. 912-84)) and, "[b]y September 2019, [she] reported overall improvement, as well as feeling more 'clear' and functional" (id. (citing Tr. 937)),[9] but those records also reflect Plaintiff's statements that she felt "pain all over" and spent "a few hours a day . . . in the fetal position and breathe[d] through [her pain]" (Tr. 942 (internal quotation marks omitted)), that her "pain [wa]s worse" which disrupted her sleep (Tr. 946), that she "live[d] in bed" (Tr. 961), that visiting the "clinic completely exhaust[ed] her" (id.), that she could not "function" (id.), that she "fe[lt] so tired she th[ought] she w[ould] die" (id.), that she "[wa]s completely debilitated by fatigue" (id.), that she had experienced "a painful month" (Tr. 977), and that she had walked twice in a week which led to increased "pain for days" (Tr. 982); and

- the ALJ also noted that, at "a telehealth visit with [Nurse] Kooistra . . . in mid-April 2020, [Plaintiff] complained of generalized body pain" but "also noted that she continued to lift weights for exercise" and "did not appear to be in any

---

[9] The statements attributed to Plaintiff actually appear on page 939 of the administrative transcript. (See Tr. 939.)

apparent distress" (Tr. 23 (citing Tr. 914)), as well as that, "[i]n late July 2020, [at a] follow up appointment . . . [Plaintiff] did not appear to be in any distress" (id. (referencing Tr. 1004)), but those treatment notes also document Plaintiff's report that her "pain [was] worse" since discontinuing prednisone (Tr. 915), and that she experienced "only 15 [percent] coverage" of her pain on Oxycodone and Baclofen (Tr. 915, 1002).

Accordingly, the ALJ erred when finding that "the treatment notes of Dr. Klein and [Plaintiff]'s primary care physician" supported the initial-level consultant's medium-exertion opinions (Tr. 24) and thus all three grounds offered by the ALJ for according "great weight" to the initial-level consultant's medium-exertion opinions (id.) lack validity.

Second, the ALJ provided insufficient and ambiguous reasons for discounting the reconsideration-level consultant's opinions that Plaintiff could perform light-exertion work without restrictions on stooping and crouching.  (Id.; see also Tr. 129-30.)  More specifically, the ALJ rejected those opinions as "not consistent with the findings of [Plaintiff]'s treating physicians and fail[ing] to adequately take into account [Plaintiff]'s own allegations."  (Tr. 24 (emphasis added).)  If the ALJ meant the phrase "findings of [Plaintiff]'s treating physicians" (id.) to refer to the less-than-sedentary-exertion functional capacity forms completed by Dr. Klein and Nurse Kooistra (see Tr. 600-04, 672-76), then, as Plaintiff argues, the ALJ's analysis "actually suggests that she th[ought the reconsideration-level consultant's light-

21

exertion opinion wa]s an <u>overestimate</u> of [Plaintiff]'s abilities"
(Docket Entry 14 at 8; <u>see also</u> Tr. 156 (Appeals Council's remand
order finding substantially similar language in ALJ's prior
decision "not . . . adequate" because "it [wa]s not clear which
opinion was considered in formulating a medium [RFC]" (referencing
Tr. 147-48))). On the other hand, if the ALJ intended the language
"findings of [Plaintiff]'s treating physicians" (Tr. 24) to denote
other unidentified clinical findings in the treatment notes of
other unnamed treating physicians, without citation to any record
evidence, that approach frustrates meaningful judicial review.

Third, the ALJ afforded "[g]reat weight" to the
reconsideration-level consultant's "conclusions with regard to
[Plaintiff]'s . . . ability to <u>climb</u>, balance, <u>kneel, and crawl</u>, as
they [we]re <u>well-supported by the treatment records and [we]re</u>
<u>generally consistent with the overall medical evidence of record</u>."
(Tr. 24 (emphasis added).) The reconsideration-level consultant
did not believe Plaintiff's impairments caused <u>any</u> limitations in
her abilities to climb, kneel, and crawl. (<u>See</u> Tr. 130.) The ALJ,
however, included limitations to <u>frequent</u> climbing of ladders,
ropes, and scaffolds, kneeling, and crawling in the RFC. (<u>See</u> Tr.
19.) Although the ALJ's inclusion in the RFC of greater
restrictions than the reconsideration-level consultant's
limitations benefitted Plaintiff by further narrowing the range of
work she could perform, it nonetheless highlights the overall

22

inconsistency of analysis which undermines the Court's ability to conduct a meaningful review of the ALJ's reasoning.

b. Dr. Klein and Nurse Kooistra

As discussed above, Dr. Klein and Nurse Kooistra provided substantially similar opinions on functional capacity forms (see Tr. 600-04, 672-76), and diagnosed Plaintiff with fibromyalgia and rheumatoid arthritis which caused her to suffer severe fatigue and chronic pain in the head, neck, hands, feet, ankles, knees, and low back (see Tr. 600, 672). Both providers limited Plaintiff to less-than-sedentary exertion (see Tr. 601, 673), opined that she could handle and finger only for up to 30 minutes in an eight-hour workday (see Tr. 602, 674), and predicted that she would remain off-task for more than 25 percent and 15 percent of a workday, respectively (see Tr. 603, 675), as well as miss work more than four days per month (see Tr. 603, 675).

The ALJ provided the following rationale for discounting those opinions:

> The [ALJ] accords little weight to the functional capacity forms completed by Dr. Klein and [Nurse] Kooistra[ ] . . . . In each case, the forms merely recited [Plaintiff]'s subjective complaints without reference to objective evidence from treatment records and described limitations which were conclusory and gave no specific guidance as to the degree and nature of [Plaintiff]'s limitations. These opinions were not well supported by the treatment notes available and were not consistent with the broad body of medical evidence as a whole.

23

(Tr. 25 (emphasis added).) Plaintiff challenges the ALJ's characterization of Dr. Klein's and Nurse Kooistra's limitations as "conclusory," as well as the ALJ's finding that those limitations lacked "consisten[cy] with the broad body of medical evidence as a whole" (id.). (See Docket Entry 14 at 9-12; see also Docket Entry 19 at 4-5.)

As an initial matter, Plaintiff does not contest the ALJ's finding that the functional capacity forms "merely recited [Plaintiff]'s subjective complaints without reference to objective evidence from treatment records" (Tr. 25). (See Docket Entry 14 at 9-12; see also Docket Entry 19 at 4-5.) Indeed, the remarks on the forms that Plaintiff could handle only 20 minutes of activity at a time, and that doing more caused weeks of exacerbated symptoms (see Tr. 600, 672) track Plaintiff's statements to Dr. Klein and Nurse Kooistra at and around the time they completed the forms (compare Tr. 600 (Dr. Klein's functional capacity form dated 4/12/17), with Tr. 615 (4/12/17 office visit with Dr. Klein reflecting Plaintiff's subjective reports of same limitations reflected on form); compare Tr. 672 (Nurse Kooistra's functional capacity form dated 10/3/18), with Tr. (9/27/18 treatment note from Nurse Kooistra documenting Plaintiff's complaints of same functional restrictions as appear on form)).

On the other hand, Plaintiff repeatedly characterized fibromyalgia as her main pain generator (see, e.g., Tr. 680) and,

24

as discussed in more detail in connection with Plaintiff's third issue on review, the Fourth Circuit has deemed fibromyalgia "a disease whose symptoms are entirely subjective," Arakas v. Commissioner, Soc. Sec. Admin., 983 F.3d 83, 96 (4th Cir. 2020) (internal quotation marks omitted), and thus held that "ALJs may not rely on objective medical evidence (or the lack thereof) – even as just one of multiple medical factors – to discount a claimant's subjective complaints regarding symptoms of fibromyalgia," id. at 97 (emphasis added). Thus, at least as concerns limitations stemming from the pain, fatigue and other symptoms of fibromyalgia, the ALJ erred by faulting Dr. Klein and Nurse Kooistra for failing to make "reference to objective evidence from treatment records" (Tr. 25) to support their opinions.

The ALJ's criticism of the forms as "describ[ing] limitations which were conclusory and gave no specific guidance as to the degree and nature of [Plaintiff]'s limitations" also falls short. As noted by Plaintiff, "both Dr. Klein and [Nurse] Kooistra were quite specific in describing the degree of [Plaintiff]'s limitations" (Docket Entry 14 at 9), including specific restrictions on sitting, standing/walking, lifting/carrying, handling, fingering, reaching, off-task time, breaks, and absence (see Tr. 600-04, 672-76).

Plaintiff also objects to the ALJ's characterization of Dr. Klein's and Nurse Kooistra's opinions as "not well supported by the

25

treatment notes available and [] not consistent with the broad body of medical evidence as a whole" (Tr. 25), arguing that "th[o]se "opinions are consistent with objective evidence in the record." (Docket Entry 14 at 10; see also id. at 10-12 (detailing evidence Plaintiff believes coheres with limitations on functional capacity forms (citing Tr. 589-99, 714-15, 720, 724, 750, 834, 843, 850, 890)).) The Court should find the ALJ's above-described rationale erroneous but for reasons different than that proffered by Plaintiff. To begin, the ALJ failed to specify what findings in "the treatment notes available" or in "the broad body of medical evidence as a whole" conflicted with the functional capacity forms (Tr. 25), which precludes this Court from tracing the path of the ALJ's reasoning. More significantly, and as discussed above and in the analysis of Plaintiff's third assignment of error, the ALJ erred by discounting Dr. Klein's and Nurse Kooistra's opinions, to the extent they describe limitations arising from fibromyalgia, Plaintiff's primary source of pain (see, e.g., Tr. 680), and "a disease whose symptoms are entirely subjective," see Arakas, 983 F.3d at 96 (emphasis added) (internal quotation marks omitted), as inconsistent with the objective medical evidence.

In light of the foregoing analysis, the ALJ failed to provide sufficient reasons for discounting the opinions of Dr. Klein and Nurse Kooistra, establishing an additional ground for remand.[10]

c. Dr. Maginn

Plaintiff next challenges the ALJ's decision to afford "no weight" to the opinions of consultative psychological examiner Dr. Maginn because they "contained little support from objective findings," "w[ere] conclusory in nature, and [] gave no specific guidance as to the degree and nature of [Plaintiff]'s limitations" (Tr. 25). (Docket Entry 14 at 12-13.) In Plaintiff's view, "Dr. Maginn reported that [Plaintiff]'s ability to respond to and deal with supervisors, clients, and coworkers would be limited to approximately 2 hours in a 40-hour work week and that she has limitations in concentration and persistence, associated with depressive symptoms and physical problems." (Id. at 12 (citing Tr. 585-88).) Plaintiff argues that "Dr. Maginn's report shows that he took a thorough medical and social history," that "[h]e observed

---

[10] In Plaintiff's Reply, she further faults the ALJ for "not apply[ing] 20 CFR 404.1527(c) in her analysis of the treating provider opinions" (Docket Entry 19 at 4), in that the ALJ failed to consider "the '[l]ength of the treatment relationship and the frequency of examination,' []or the '[n]ature and extent of the treatment relationship'" (id. at 5 (quoting Dowling v. Commissioner of Soc. Sec. Admin., 986 F.3d 377, (4th Cir. 2021), in turn quoting 20 C.F.R. § 404.1527(c)(2)(i)-(ii) (internal quotation marks omitted))). The ALJ's discussion of the medical evidence, however, makes clear that she acknowledged the fact that Dr. Klein and Nurse Kooistra constituted treating sources, had treated Plaintiff from at least 2016 until the time of the hearing, and prescribed a variety of medications to alleviate Plaintiff's symptoms. (See Tr. 20-23.) That discussion satisfies the ALJ's obligation to consider the factors in Section 404.1527(c)(i) and (ii).

slowness in [Plaintiff's] movements," and that he recorded "errors in [her] memory recall." (Id. at 13 (citing Tr. 585-87).)

At the outset, Plaintiff overstates the breadth of Dr. Maginn's opinions – Dr. Maginn did not opine that Plaintiff's "ability to respond to and deal with supervisors, clients, and coworkers would be limited to approximately 2 hours in a 40-hour work week" (id. at 12); rather, he merely noted Plaintiff's subjective report that she "ha[d] worked as a fashion consultant and still d[id] that on a very limited basis, approximately two hours per week," that "she had online clients that she help[ed,] and that she limit[ed] her work due to the experience of pain and the feelings of exhaustion" (Tr. 586 (emphasis added)). Dr. Maginn then noted, in his summary, that Plaintiff "limits herself to two hours per week doing routine and repetitive type task [sic], doing business type work out of a 40-hour work week," and immediately thereafter stated that Plaintiff's "ability to respond and deal with clients and coworkers, respond to supervision appears limited to approximately two out of the 40-hour work week." (Tr. 587 (emphasis added).) Thus, in the summary portion of the evaluation, Dr. Maginn merely reiterated Plaintiff's subjective report of self-limitation "due to the experience of pain and the feelings of exhaustion" (Tr. 586 (emphasis added)) and did not opine that Plaintiff's mental symptoms limited her to two hours of work per week.

28

Moreover, the ALJ did not err in finding that Dr. Maginn's opinions "w[ere] conclusory in nature, and [] gave no specific guidance as to the degree and nature of [Plaintiff]'s limitations," while also "contain[ing] little support from objective findings." (Tr. 25.) Dr. Maginn diagnosed only "an <u>unspecified</u> long-standing depressive disorder" (Tr. 587 (emphasis added)), and opined that Plaintiff "ha[d] <u>limitations</u> in concentration and persistence, associated with depressive symptoms and <u>physical problems that c[ould] be best described by her physicians</u>" (<u>id.</u> (emphasis added)). Dr. Maginn did not quantify or further describe Plaintiff's "limitations" in concentration and persistence, and "associated" those "limitations," in part, with "physical," and not mental, "problems." (<u>Id.</u>) Furthermore, Dr. Maginn's report documents "very satisfactory" dress and hygiene (Tr. 585), "average to above average" overall abilities (<u>id.</u>), "some slowness about [Plaintiff's] <u>movements</u>" (<u>id.</u> (emphasis added)), normal speech and thoughts (<u>see</u> Tr. 586), full orientation (<u>see</u> <u>id.</u>), recall of eight digits forward and four in reverse and of four out of five objects after a five-minute delay (<u>see</u> <u>id.</u>), "specific" recollection of recent events (<u>id.</u>), error-free calculations and serial 3s with only one error in serial 7s (Tr. 587), and intact fund of knowledge, abstraction, and judgment (<u>id.</u>). Those findings simply

29

do not provide objective support for limitations in concentration and persistence.[11]

d. <u>State Agency Psychological Consultants</u>

Plaintiff next attacks the ALJ's decision to assign "great weight" to the state agency psychological consultants' opinions that Plaintiff's depression rated as non-severe (Tr. 24; <u>see also</u> Tr. 112-13, 126-28), because "[t]h[o]se opinions, provided in 2017, were more than three years old by the time the ALJ issued her decision" (Docket Entry 14 at 13) and thus the consultants "had no access to the evidence of mental health impairment that ha[d] entered the record in the [] three years [following their opinions], including the treatment notes from the pain psychologist who described [Plaintiff]'s depression as moderate" (<u>id.</u> at 14 (citing Tr. 758, 886, 897, 911); <u>see also</u> <u>id.</u> at 14-15 (citing Tr. 566-69)). Plaintiff further points out that the initial-level consultant "provided little explanation for the non-severe finding" and "did not even discuss [Dr. Maginn]'s findings that [Plaintiff] had significant impairment in her ability to maintain concentration, persistence, and pace" (<u>id.</u> at 14 (citing Tr. 113)),

---

[11] Plaintiff also contends that "[t]he ALJ failed to address the fact that [Dr. Maginn's] opinion was fully consistent with the opinions of [Plaintiff]'s treatment providers as well as [her] pain psychologist." (Docket Entry 14 at 13.) Plaintiff did not, however, provide the Court with any citations to record evidence that she believed supported Dr. Maginn's opinions. (<u>See</u> <u>id.</u>; <u>see also</u> Docket Entry 19.) That failure precludes relief. <u>See</u> <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); <u>Hughes v. B/E Aerospace, Inc.</u>, No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do.").

and that the reconsideration-level consultant "offered no analysis" (id. (citing Tr. 127)).

As a threshold matter, and as explained above, Dr. Maginn did not opine that Plaintiff "had significant impairment in her ability to maintain concentration, persistence, and pace" (id. (emphasis added)); rather, he merely found that Plaintiff had unspecified "limitations in concentration and persistence" (Tr. 587). Moreover, and contrary to Plaintiff's contentions, the initial-level consultant provided a sufficient analysis to support her non-severity finding, nearly the entirety of which discussed Dr. Maginn's findings:

> No mental health allegation, however [Plaintiff] listed [a] fluoxetine [prescription]. <u>She attended [a] consultative psychological examination with Dr. Maginn on] 1/31/17, [and] drove herself there. She has [diagnoses] for fibromyalgia and inflammatory arthritis, [and complains of] pain and feeling exhausted, [and] some depressive features improved with taking medications. Her thoughts [were] clear, [and a mental status examination was] entirely [within normal limits]. She lives with [her] 13 year old son, [and] handles bills/cooking/shopping/cleaning for [the] household. She socializes with friends, and works 2 hours ([Tr. 442] states 3 hours) per week as fashion consultant</u>.
>
> Based on evidence as a whole, considering [Plaintiff]'s lack of mental allegation and the fact it improves on medication, it appears this impairment is non-severe.

(Tr. 113 (emphasis added).)

Plaintiff's additional assertion that the reconsideration-level consultant "offered no analysis" (Docket Entry 14 at 14

31

(citing Tr. 127)) entirely ignores the following discussion by that

consultant:

> No mental allegations however [Plaintiff] had depression
> with [prescription] fluoxetine listed on [a Disability
> Report (Tr. 417)] . . . .
>
> 1/31/17([consultative psychological examination] –
> Maginn): Drove herself to evaluation. [Mental status
> examination] thoughts clear, no ideas of reference, no
> [suicidal ideation], cognition [normal.] Overall
> intellectual functioning in above av[erage] range by past
> educational h[istory] and present assessment, overall
> insight- [Plaintiff] tends to focus on physical health
> conditions/mental health issues. [Complains of] pain and
> feeling of exhaustion and co-existing depressive features
> improved with taking medications. Diagnostic Impression:
> unspecified long-standing depressive disorder. [Medical
> source opinion]: [Plaintiff] limits herself to two hours
> per week doing routine and repetitive type task, doing
> business type work out of 40 hours work week. Her
> ability to respond and deal with clients and coworkers,
> respond to supervision appears limited to approximately
> two out of 40 hour work week. <u>She has limitations in
> concentration and persistence, associated with depressive
> symptoms and physical problems that can be best described
> by her physicians</u>. Capable of managing benefits in her
> own best interest.
>
> . . .
>
> 01/25/2017, [Function Report (Tr. 431-38)]: [Plaintiff]
> spends about 2 hours working on computer or running
> errands. [Plaintiff] prepares dinner and oversee's [sic]
> son's homework. [Plaintiff] has difficulty
> dressing/bathing and getting ready to go places.
> [Plaintiff] cooks big batches of soup/stews/casseroles
> and freezes for later use. [Plaintiff] does essential
> cleaning/laundry. [Plaintiff] shops for food/toiletries
> 1-2[ times per] week for approx[imately] 20 min[ute]s.
> [Plaintiff] can handle money. [Plaintiff] cannot hold a
> book for any length of time, [and] outings to museum
> w[ith her] son are very painful/difficult. [Plaintiff]
> endorses postural limitations. [Plaintiff] can walk 1/4
> mile before resting. [Plaintiff] endorses foggy brain
> w[ith] written and spoken instructions. [Plaintiff] can
> pay attention 2 h[ou]rs at most. [Plaintiff] reports

32

> having [a] non[-prescribed] walker w[ith a] seat she uses
> in places where she has to stand for long periods of
> time.
>
> . . .
>
> Summary: Based on totality of evidence in file,
> [Plaintiff] has non severe mental impairment.

(Tr. 127 (emphasis added).) That lengthy discussion, which expressly addressed Dr. Maginn's opinion regarding Plaintiff's "limitations in concentration and persistence" (id.; see also Tr. 587) but nevertheless found her depression non-severe, certainly suffices to support the reconsideration-level consultant's non-severity finding.

Furthermore, Plaintiff's citation to certain evidence post-dating the consultants' opinions does not render their conclusions unsupported by substantial evidence. (See Docket Entry 14 at 14 (citing Tr. 758, 886, 897, 911); see also id. at 14-15 (citing Tr. 566-69).) The four cited records from Plaintiff's pain psychologist, Dr. Skye Mims Ochsner Margolies, cover only the brief time period from February 15, 2019 (see Tr. 758), to April 26, 2019 (see Tr. 897), and contain evidence of both "mild" depression (Tr. 757 (reflecting "mild" depression score on Beck Depression Inventory), 886 (diagnosing "[m]ajor depressive disorder, mild")) and "moderate" depression (Tr. 886, 897, 911 (finding depression symptoms "in the moderate range")). The third-party statement dated June 24, 2020, from Plaintiff's friend, Beth A. Holley, (see Tr. 566-59)) observes that Plaintiff "[wa]s often unable to follow

33

conversations and complex discussions" (Tr. 566), that she "often"
had "to communicate via email or messaging" because "having it in
writing help[ed] her keep track" (id.), that, "[a]s [Plaintiff]
ha[d] become less able to work and ha[d] more medical needs, it
ha[d] increased her depression, anxiety and panic" (Tr. 567), and
that "[t]he stress, anxiety and depression often affect[ed] her
ability to sleep" (id.), remarks which mirrored Plaintiff's
statements in evidence already before the consultants (see Tr. 436
(Plaintiff's statement on Function Report that her "foggy brain
interfere[d] with concentration and communication" and could cause
"difficulty" with following instructions), 586 (Plaintiff's remark
to Dr. Maginn "that when she is not on her medication[, ] she is
moody, depressed, and can demonstrate some anger," as well as that
she experienced "deeper depression for six hours per
day . . . perhaps once per month"), 589-90 (Plaintiff's report to
Dr. Dearinger that her fibromyalgia symptoms included "fatigue"
such that she could not "stay awake" and "foggy brain" which caused
her to "have trouble thinking and speaking clearly")).

    Additionally, the ALJ discussed substantial evidence post-
dating the consultants' opinions that supported her decision to
accord great weight to the consultants' non-severity findings.
(See Tr. 21 (noting that Plaintiff's "depression issues [] 
improved, with her [Patient Health Questionnaire ('PHQ') - 9] score
dropping as low as five and never exceeding the 'mild depression'

34

level,"[12] and that, "[b]y April 2018, [Plaintiff] was no longer taking medication for depression, and did not exhibit any breakthrough symptoms" (citing Tr. 664)), 23 (observing that Plaintiff's "mood was good even without medication, and she was noted to have normal attention and concentration on exam" (citing Tr. 922-23), and pointing to findings of no acute distress, clear speech, and baseline psychological symptoms despite complaints of anxiety and agoraphobia (citing Tr. 1002-04)).)

In light of the foregoing analysis, Plaintiff's first assignment of error establishes prejudicial errors in the ALJ's evaluation and weighing of the opinions of the state agency medical consultants, Dr. Klein, and Nurse Kooistra, which require remand.

## 2. Mental Limitations

Next, Plaintiff maintains that "[t]he ALJ erred in finding that [Plaintiff] has no mental limitations." (Docket Entry 14 at 15 (bold font and capitalization omitted); see also Docket Entry 19 at 10.) According to Plaintiff, "evidence demonstrates that there is more than minimal limitation in [Plaintiff]'s mental ability to do basic work activities." (Docket Entry 14 at 15 (citing Tr. 585-88 (Dr. Maginn's opinions), 600-05 (Dr. Klein's opinions), and 672-76 (Nurse Kooistra's opinions)); see also id. at 16 (citing Tr.

_____

[12] The ALJ cited Exhibit "6F/4, 12, 18, 29" as support for that statement; however, Exhibit 6F contains only 15 total pages (see Tr. 657-71), and the corresponding pages of Exhibit 6F/4, 12, i.e., Tr. 660 and 664, do not contain PHQ-9 scores. That mis-citation by the ALJ does not amount to harmful error, as the record contains PHQ-9 scores in the "mild" range in 2018 at pages 679-80 (10/25/18), 688 (9/27/18), 694-95 (8/30/18), and 705 (6/22/18).

624, 648, 650, 688-89, 694, 705, 758, 938, and 946 as "treatment notes [that] document [her] frequent complaints of trouble concentrating," citing Tr. 492-523 as entries in her symptom log that "make[] frequent reference" to concentrational difficulties, and citing Tr. 679-80, 688, 694, 705, 938, and 972 as documenting "depression[] screens [that] typically indicate[d] that [her] symptoms ma[d]e it 'extremely' difficult to work, take care of things at home, or get along with people").)

Plaintiff alternatively contends that "[t]he ALJ's classification of [Plaintiff]'s depression as 'non-severe' did not circumvent [the ALJ's] obligation to consider its effects in assessing [RFC]." (Id.) In Plaintiff's view, "[i]f the ALJ identifies mental limitations at step 3 [of the SEP], but includes no mental restrictions in the RFC, [s]he must provide a rationale sufficient for subsequent review." (Id.; see also id. at 17 (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)).) Plaintiff notes that, although "the ALJ found . . . that [Plaintiff] had mild limitations in three of the four areas of mental functioning: 1) understanding, remembering, applying information; 2) concentration, persistence or maintaining pace [('CPP')]; and 3) adapting or managing herself[,] . . . [the ALJ] included no mental limitations in his [sic] RFC, nor did she provide any explanation for the inconsistency." (Id. at 17.) Plaintiff deems the ALJ's error in that regard "harmful," noting

36

that "[e]ven a limitation to simple, routine[, and] repetitive tasks would preclude [Plaintiff]'s past relevant work." (Id.)  For the reasons explained below, Plaintiff's arguments fail as a matter of law.

An impairment does not qualify as "severe" if it constitutes "only a slight abnormality . . . which would have no more than a minimal effect on an individual's ability . . . to perform basic work activities." Social Security Ruling 85-28, Titles II and XVI: Medical Impairments that Are Not Severe, 1985 WL 56856, at *3 (1985) ("SSR 85-28").  In the context of mental impairments, the ALJ must rate Plaintiff's degree of functional limitation from her depression in four broad functional areas (understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself) using a five-point scale of none, mild, moderate, marked, and extreme.  See 20 C.F.R. § 404.1520a(c).  If the ALJ finds that Plaintiff has no more than mild limitation in the four broad functional areas, then Plaintiff's depression rates as non-severe.  See 20 C.F.R. § 404.1520a(d)(1).  Plaintiff bears the burden of proving severity at step two.  Hunter, 993 F.2d at 35.

The ALJ found that Plaintiff had "no limitation" in interacting with others (Tr. 17), and provided the following rationale supporting the decision to find "mild limitation" in the three remaining areas of mental functioning in question:

37

The first functional area is understanding, remembering, or applying information. In this area, [Plaintiff] has a mild limitation. This criterion pertains to the abilities to learn, recall, use terms, instructions, and procedures, follow one- to two-step oral instructions, describe work activity to someone else, ask and answer questions, recognize and correct a mistake, identify and solve problems, and use reason and judgment to make work-related decisions. [Plaintiff] testified that she has problems and issues with her focus and concentration. However, there was no indication of any deficits in treatment notes, and [Plaintiff] was noted to have intact thought processes and was free from auditory or visual hallucinations. Further, [Plaintiff] was able to attend medical appointments without assistance and was able to ask and answer questions appropriately at her medical appointments. At the hearing, she was able to adequately describe her work activity.

. . .

With regard to [CPP], [Plaintiff] has a mild limitation. [She] indicated that she had difficulty concentrating and staying focused when her fibromyalgia symptoms were exacerbated, but she consistently displayed good attention and focus during medical appointments. [Plaintiff] also indicated that she spent a great deal of time reading, watching television, and writing a novel, all of which require sustained concentration and attention.

The fourth functional area is the ability to adapt or manage oneself. [Plaintiff] has experienced a mild limitation in this area. This refers to an individual's ability to respond to demands, adapt to changes, manage psychologically based symptoms, distinguish between acceptable and unacceptable performance, maintain appropriate hygiene and attire, and maintain awareness of hazards and take appropriate precautions. [Plaintiff] alleged issues with depression, anxiety, and agoraphobia, generally secondary to her fibromyalgia pain. However, [she] generally presented with a normal mood, affect, and behavior, which evidences her ability to manage psychologically based symptoms and to distinguish between acceptable and unacceptable performance. Her activities of daily living include the ability to drive and to care for her child, which evidence her ability to maintain awareness of ordinary hazards and take appropriate

38

precautions. Overall, the longitudinal record supports a finding that [Plaintiff] has no more than mild limitations in this functional area.

(Tr. 16-17 (internal parenthetical citations omitted).) That analysis marshaled substantial evidence to support the ALJ's step two non-severity finding regarding Plaintiff's depression.

Significantly, Plaintiff does not challenge <u>any</u> of the above-quoted analysis by the ALJ (<u>see</u> Docket Entry 14 at 15-17; <u>see also</u> Docket Entry 19 at 10) but, rather, emphasizes other record evidence that she believes supports a severity finding (<u>see</u> Docket Entry 14 at 15 (citing Tr. 585-88, 600-05, and 672-76); <u>see also</u> <u>id.</u> at 16 (citing Tr. 492-523, 624, 648, 650, 679-80, 688-89, 694, 705, 758, 938, 946, and 972 )). By pointing to record evidence Plaintiff believes conflicts with the ALJ's non-severity finding, she misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," <u>Mastro</u>, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's non-severity finding, and not whether other record evidence weighed against that finding, <u>see</u> <u>Lanier v. Colvin</u>, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

39

Moreover, as discussed in the context of Plaintiff's first assignment of error, the ALJ supported with substantial evidence her decision to accord "great weight" (Tr. 24) to the state agency psychological consultants' opinions that Plaintiff's depression qualified as non-severe (see Tr. 112-13, 126-28). That decision, as well as the ALJ's above-quoted rationale supporting her step two non-severity finding <u>and</u> the ALJ's discussion of mental health evidence post-dating the state agency psychological consultants' opinions (as described in connection with Plaintiff's first issue on review), supplies substantial evidence to support the ALJ's non-severity finding regarding Plaintiff's depression at step two.

Regarding Plaintiff's argument under <u>Mascio</u>, the United States Court of Appeals for the Fourth Circuit, in finding that an ALJ failed to account in the RFC for the claimant's <u>moderate</u> limitation in <u>CPP</u>, held that "the ability to perform simple tasks differs from the ability to stay on task," and that "[o]nly the latter limitation would account for a claimant's limitation in [CPP]." <u>Mascio</u>, 780 F.3d at 638. However, as a neighboring district court has explained:

> *Mascio* does not broadly dictate that a claimant's moderate impairment in [CPP] always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision . . . .

<u>Jones v. Colvin</u>, No. 7:14CV00273, 2015 WL 5056784, at *10 (W.D. Va. Aug. 20, 2015) (magistrate judge's recommendation adopted by

40

district judge) (unpublished) (emphasis added); see also Mascio, 780 F.3d at 638 ("Perhaps the ALJ can explain why [the plaintiff's] moderate limitation in [CPP] at step three does not translate into a limitation in [her RFC]." (emphasis added)).

Furthermore, it remains unclear whether Mascio applies to mild as opposed to moderate limitations, and to limitations in broad functional areas other than CPP. Although some cases exist finding remand warranted for an ALJ's failure to adequately account for mild limitations in the broad areas of functioning, see McMichael v. Colvin, No. 1:15CV528, 2016 WL 4556768, at *2-6 (M.D.N.C. Aug. 31, 2016) (unpublished) (Webster, M.J.), recommendation adopted, slip op. (M.D.N.C Sept. 29, 2016) (Schroeder, J.) (CPP); Ashcraft v. Colvin, No. 3:13CV417, 2015 WL 9304561, at *6-11 (W.D.N.C. Dec. 21, 2015) (unpublished) (daily activities, social functioning, and CPP), many cases exist to the contrary, see Martin v. Saul, No. 9:18CV3172, 2020 WL 2813788, at *8 (D.S.C. Jan. 16, 2020) (unpublished) (noting that "most district court decisions [in the Fourth Circuit] have found to the contrary"), recommendation adopted, 2020 WL 1329395 (D.S.C. Mar. 23, 2020) (unpublished); Morrison v. Berryhill, No. 1:16CV337, 2018 WL 1311207, at *5 (W.D.N.C. Feb. 8, 2018) (unpublished) (finding that the plaintiff's "heavy reliance on *Mascio* . . . [wa]s misplaced" and noting that, since "about a month after the *Mascio* decision," many cases in the Western District of North Carolina "have held that the requirements

41

of *Mascio* do not necessarily apply where a plaintiff is found to have mild limitations in CPP"), recommendation adopted, 2018 WL 1308139 (W.D.N.C. Mar. 13, 2018) (unpublished); Thorp v. Berryhill, 3:16CV70, 2018 WL 325318, at *3 (W.D.N.C. Jan. 8, 2018) (unpublished) (holding that the "case differ[ed] markedly from *Mascio*" because the plaintiff "had mild difficulties maintaining [CPP]" (emphasis added)); Williamson v. Berryhill, No. 7:16CV284, 2017 WL 4293408, at *5 (E.D.N.C. Sept. 27, 2017) (unpublished) (deeming the "plaintiff's reliance on *Mascio* [] inapt" where ALJ found "only mild limitations in activities of daily living, social functioning, or CPP"); Franklin v. Berryhill, 1:16CV211, 2017 WL 4274190, at *2-3 (W.D.N.C. Sept. 26, 2017) (unpublished) ("This Court does not interpret *Mascio*'s holding as applying to all restrictions."); Gilbert v. Berryhill, 5:16CV100, 2017 WL 1196452, at *3 (W.D.N.C. Mar. 29, 2017) (unpublished) ("As this case concerns only 'mild difficulties,' it does not trigger the RFC discussion requirements of *Mascio* per se." (emphasis added) (internal quotation marks omitted)); Guest v. Colvin, No. 1:15CV776, 2016 WL 4007612, at *6 (M.D.N.C. July 26, 2016) (unpublished) (expressing "doubt [] as to whether Mascio's holding with regards to [CPP] should apply to" a case involving mild limitations in social functioning, "particularly given that the Fourth Circuit made clear its CPP-based holding rested on the distinction between the ability to perform simple tasks and the

42

ability to stay on task, and such a distinction does not clearly apply in the social functioning context" (internal citation omitted), recommendation adopted, slip op. (M.D.N.C. Aug. 24, 2016) (Schroeder, J.); Thompson v. Colvin, 1:15CV234, 2016 WL 3610161, at *3 (W.D.N.C. July 1, 2016) (unpublished) ("The Court does not read Mascio to impose a duty on ALJs to automatically or necessarily account for mild limitations in the RFC." (emphasis added)). The weight of post-Mascio authority among the district courts in the Fourth Circuit does not favor extending Mascio to mild limitations in the broad functional areas.

Moreover, even assuming Mascio applies to mild limitations in the broad areas of functioning (i.e., the lowest of four levels above "none"), and to other areas of mental functioning beyond CPP, Plaintiff has not shown prejudicial error here. Plaintiff does not suggest what additional limitations the ALJ should have included in the RFC to account for Plaintiff's mild limitation in CPP, beyond the remark that "even a limitation to simple, routine[, and ] repetitive tasks would preclude [her] past relevant work." (Docket Entry 14 at 17; see also Docket Entry 19 at 10.) That failure dooms Plaintiff's argument. See Humphries v. Colvin, No. 3:15CV376, 2016 WL 8223429, at *5 (W.D.N.C. Oct. 17, 2016) (rejecting similar claim where "it d[id] not appear that [the p]laintiff [wa]s actually alleging based on contradictory evidence in the record that she ha[d] limitations that [we]re not addressed

43

by the RFC; rather, she [wa]s simply arguing that her 'at most, mild limitations' [we]re cause for remand because the ALJ's decision d[id] not apply the same analysis the Fourth Circuit [in *Mascio*] would require for review of 'moderate' limitations in [CPP]" (emphasis added)), recommendation adopted, 2017 WL 525666 (W.D.N.C. Feb. 8, 2017) (unpublished).

In sum, Plaintiff's second issue on review lacks merit.

### 3. Over-Reliance on Objective Medical Evidence

Plaintiff's third assignment of error maintains that "[t]he ALJ erred in requiring objective evidence to substantiate [Plaintiff]'s claims" (Docket Entry 14 at 17 (bold font, capitalization, and single-spacing omitted)), in violation of Arakas (see Docket Entry 14 at 18-19). In that regard, Plaintiff emphasizes that Arakas prohibits the ALJ from "'disregard[ing] an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate them.'" (Docket Entry 14 at 18 (quoting Arakas, 983 F.3d at 95) (internal quotation marks omitted).) Plaintiff further contends that, "[a]s noted in *Arakas*, fibromyalgia is a disease whose symptoms are entirely subjective, with the exception of trigger-point evidence" (id. at 19 (citing Arakas, 983 F.3d at 96-97)), and that "'ALJs may not rely on objective medical evidence (or the lack thereof) – even as just one of multiple medical factors – to discount a claimant's subjective

44

complaints regarding symptoms of fibromyalgia'" (id. (quoting Arakas, 983 F.3d at 97)).

According to Plaintiff, "the ALJ found that [Plaintiff] has numerous medically determinable impairments [ including] fibromyalgia . . . that could reasonably be expected to produce some of her alleged symptoms" (id. at 18 (citing Tr. 20)), but then "decided not to credit [Plaintiff]'s allegations regarding [the] severity of symptoms caused by th[ose impairments] because the 'objective evidence in this case c[ould not] be fully reconciled with [Plaintiff]'s allegations of symptoms and limitations'" (id. (quoting Tr. 24)). Plaintiff further notes that, "[e]lsewhere, the ALJ reiterate[d] that she only credited the limitations described by [Plaintiff] that are directly supported by objective evidence: 'The medium [RFC] accommodates those limitations described in [Plaintiff]'s testimony and supported by the objective medical evidence of record'" (id. at 18-19 (quoting Tr. 24)). Plaintiff thus argues that "[t]he ALJ's evaluation of [Plaintiff]'s symptoms was based on an incorrect legal standard," and that "[r]emand is warranted on th[at] basis alone." (Id. at 19.) Those contentions establish an additional basis for remand.

Just over a month after the ALJ issued the decision under review, the Fourth Circuit decided Arakas in which it deemed fibromyalgia a "unique" disease, Arakas, 983 F.3d at 97, with "symptoms [that] are entirely subjective," id. at 96, while also

45

noting that "physical examinations of patients with fibromyalgia will usually yield normal results — a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions," id. (brackets omitted).  The Fourth Circuit thus held that "ALJs may not rely on objective medical evidence (or the lack thereof) – even as just one of multiple medical factors – to discount a claimant's subjective complaints regarding symptoms of fibromyalgia," because "[o]bjective indicators such as normal clinical and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease," id. at 97 (emphasis added).

Here, at step two of the SEP, the ALJ found that Plaintiff's fibromyalgia constituted a severe impairment, because it "significantly limit[ed her] ability to perform basic work activities" (Tr. 16), but found, at step three, that her fibromyalgia did not meet or medically equal the criteria of any of the Commissioner's listed impairments (see Tr. 19).  As a result, the ALJ proceeded to determine Plaintiff's RFC and, as part of that analysis, evaluated Plaintiff's subjective symptom reporting.  (See Tr. 19-23.)  In that regard, the ALJ "f[ound] that [Plaintiff]'s medically determinable impairments [including fibromyalgia] could reasonably be expected to cause some of the alleged symptoms," but thereafter found that her "statements concerning the intensity,

persistence and limiting effects of th[o]se symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision." (Tr. 20.) After summarizing some of the record evidence, including noting findings such as "good coordination and balance" (Tr. 21), "a normal gait without the use of an assistive device" (id.), "normal muscle strength, tone, and bulk (id.), "no evidence of muscle spasms" (id.), normal reflexes (see id.), a negative straight leg raise test (see id.), intact sensation (see Tr. 22), "adequate" grip strength (id.), "no swelling" (id.), and "full range of motion in her shoulders and elbows" (id.), the ALJ concluded as follows:

> [T]he objective evidence in [Plaintiff's] case cannot be fully reconciled with [her] allegations of symptoms and limitations. While the record confirms that [Plaintiff] has been extensively evaluated and treated for her symptoms and t[ook] a number of medications, the objective clinical and laboratory diagnostic findings reported by her treating and examining medical sources do not support the limitations she alleges, or otherwise establish functional limitations that would preclude the range of medium exertion called for in the RFC.

> The less than medium [RFC] accommodates those limitations described in [Plaintiff]'s testimony and supported by objective medical evidence of record, accounting for [Plaintiff]'s continued pain and fatigue associated with her fibromyalgia . . . .

(Tr. 24 (emphasis added).)

The ALJ's clear reliance on objective medical evidence to discount Plaintiff's subjective symptom reports of fibromyalgia pain, fatigue, and other symptoms runs directly afoul of Arakas. See Sandra P. v. Commissioner of Social Security, No. 2:21CV127,

47

2022 WL 815463, at *9 (E.D. Va. Mar. 1, 2022) (unpublished) (finding "*Arakas* prohibited" ALJ's reliance on "intact strength and a normal gait[]" in assessing the plaintiff's "complaints of pain related to her fibromyalgia," and deeming ALJ's erroneous findings regarding the plaintiff's fibromyalgia "critical [] because they led [the ALJ] to conclude that [the p]laintiff was capable of nearly the full range of medium work with few postural limitations due to her fibromyalgia pain"), recommendation adopted sub nom. Sandra P. v. Kijakazi, 2022 WL 811295 (E.D. Va. Mar. 16, 2022) (unpublished); India G. v. Kijakazi, Civ. No. 20-1704, 2021 WL 3930430, at *1-2 (D. Md. Sept. 1, 2021) (unpublished) ("It is clear . . . that the ALJ used normal, objective evidence as a factor in discounting [the] plaintiff's subjective complaints about the limiting effects of her fibromyalgia. This is error after *Arakas*." (internal footnote and citation omitted)); Bryson v. Berryhill, No. 1:20CV169, 2021 WL 2517682, at *6 (W.D.N.C. June 18, 2021) (unpublished) ("[T]he ALJ erred when he applied the incorrect legal standard by considering objective evidence as a factor in evaluating [the p]laintiff's subjective symptoms of fibromyalgia, which essentially required [the p]laintiff to prove her subjective symptoms of fibromyalgia with objective evidence."); Midgett v. Saul, No. 2:19CV46, 2021 WL 1230188, at *3 (E.D.N.C. Mar. 31, 2021) (unpublished) ("[T]he ALJ's opinion [] suggests an improper

48

reliance upon clinical findings to discredit fibromyalgia complaints, contrary to the direction in *Arakas*.").

Moreover, the Court should not find the ALJ's error under Arakas harmless given the facts of this case. To begin, the Commissioner did not argue in brief that the ALJ's consideration of objective evidence in his analysis of Plaintiff's fibromyalgia should qualify as harmless error. (See Docket Entry 17 at 16-19.) More significantly, the Court cannot, on the record before it, conclude that remand for the ALJ's proper consideration of Plaintiff's alleged fibromyalgia pain and fatigue under Arakas would not lead to a favorable outcome in Plaintiff's claim. In discounting Plaintiff's subjective symptom reporting, the ALJ relied heavily on Plaintiff's ability to engage in "activities of daily living which altogether reflect[ed] a significant functional capacity that [wa]s not consistent with allegations of symptoms so severe as to preclude work within the parameters of the [RFC]." (Tr. 23 (emphasis added).) As explained in more detail below in connection with Plaintiff's fourth assignment of error, however, the ALJ's description of Plaintiff's ability to perform daily activities overlooked the qualifications and limitations that Plaintiff consistently placed on those activities. (See id.) Under such circumstances, the Court should not deem the ALJ's Arakas error harmless.

49

Put simply, Plaintiff's third assignment of error demonstrates prejudicial error under Arakas, establishing an additional ground for remand.

### 4. Mischaracterization of Evidence

In Plaintiff's fourth issue on review, she asserts that "[t]he ALJ mischaracterized the evidence and cherry-picked from the record." (Docket Entry 14 at 20 (bold font, capitalization, and single-spacing omitted); see also Docket Entry 19 at 7-9.) In particular, Plaintiff contends that, "[i]n reaching [the] RFC assessment, the ALJ violated the principles articulated by the Fourth Circuit in *Lewis v. Berryhill*, 858 F.3d 858[, 869] (4th Cir. 2017) by 'cherry picking' evidence and in finding relatively undemanding activities indicative of an ability to perform work requiring medium exertion." (Docket Entry 14 at 20; see also Docket Entry 19 at 7 ("The ALJ must explain why a particular activity reflects the ability to sustain full-time work." (citing Arakas, 983 F.3d at 99-101, Woods, 888 F.3d at 695, and Brown v. Commissioner Soc. Sec. Admin., 873 F.3d 251, 263 (4th Cir. 2017)).) Plaintiff specifically takes issue with the ALJ's characterization of Plaintiff's abilities to "visit others" (Docket Entry 14 at 20 (citing Tr. 17)), engage in interests such as "reading, watching television, and writing a novel" (id.; see also Docket Entry 19 at 8), work one to two hours per week as a fashion consultant (see Docket Entry 14 at 20-21; see also Docket Entry 19 at 8), exercise

50

(see Docket Entry 14 at 21; see also Docket Entry 19 at 9), and care for her son and household (see Docket Entry 19 at 8-9). Plaintiff's contentions with regard to certain of her daily activities have merit and establish a further reason for remand.

The ALJ offered the following analysis of Plaintiff's ability to engage in daily activities:

> The record also shows that [Plaintiff] engaged in activities of daily living which altogether reflect a significant functional capacity that is not consistent with allegations of symptoms so severe as to preclude work within the parameters of the [RFC] found [in the ALJ's decision]. For instance, [Plaintiff] takes care of her son without assistance, preparing him for school in the mornings and ensuring that he does his homework after school. [S]he also drives him to his doctor appointments and is involved in his schooling. [Plaintiff] prepares meals for herself and her son, cleans her home, and does the laundry. She reports being able to take care of her own hygiene and take medication without reminders or encouragement. She admits to getting out of the house at least twice per week and is able to drive herself without complications in order to go shopping and run other errands. [Plaintiff] reports that she swims, walks, bikes, and lifts weights, and she has sufficient concentration and persistence to engage in extensive reading. She also reports sufficient persistence and cognitive clarity to write a mystery novel. She engages in weekly social interaction with her friends, and has no difficulties in interacting with authority or handling stress and change.

(Tr. 23 (emphasis added).) For the following reasons, that analysis by the ALJ overstated Plaintiff's ability to engage in certain daily activities.

Despite the ALJ's observation that Plaintiff can cook, clean her home, do her laundry, and take care of her personal hygiene without qualification (see id.), Plaintiff consistently indicated

51

that she could only engage in such activities on a very limited
basis. With regard to cooking, Plaintiff's statements reflect that
she eats and prepares most of her meals in bed (see Tr. 57, 82),
cooks in a crock pot or heats frozen foods rather than cooking
meals that require her to stand (see Tr. 83), spends five to ten
minutes per day in meal preparation (see Tr. 433), orders takeout
more often (see id.; see also Tr. 753), and engages in "big batch
cooking" of meals that she freezes for later consumption (Tr. 433;
see also Tr. 615, 753). As concerns her ability to clean her home
and do laundry, Plaintiff stated that she performs chores "in bits
and pieces" (Tr. 56), and that she does "essential cleaning[ and]
laundry" one time per week in five to ten minutes intervals (Tr.
433). Respecting self-care, Plaintiff testified that she takes
about two hours to get ready as she has to shower while sitting, as
well as dress, style her hair, and put on make-up in increments
(see Tr. 48; see also Tr. 432), that she has trouble getting out of
the tub and off of the toilet (see Tr. 80), and that she showers
and dresses only about twice per week (see Tr. 57). As pertains to
exercise, Plaintiff's statements reflect that she tried to swim,
walk, and bike because her treatment providers all recommended
exercise to alleviate her fibromyalgia symptoms (see Tr. 87), but
that exercise increased her pain and other symptoms (see Tr. 49,
80, 87-88, 621, 680, 710, 717, 901, 982) so she tried to lift light

weights for five to ten minutes per day to prevent atrophy (see Tr. 88).

As the above-described evidence makes clear, the ALJ's description of Plaintiff's abilities to cook, clean, do laundry, care for herself, and exercise does not fairly capture the limitations and qualifications Plaintiff consistently placed on her ability to perform them. "An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." *Woods*, 888 F.3d at 694 (emphasis in original). As recognized in <u>Arakas</u>:

> Substantial evidence does not support the ALJ's conclusion that [the plaintiff]'s subjective complaints were inconsistent with her daily activities, because the record, when read as a whole, reveals no inconsistency between the two. The ALJ selectively cited evidence concerning tasks which [the plaintiff] was capable of performing and improperly disregarded her qualifying statements. Thus, he failed to build an accurate and logical bridge from the evidence to his conclusion.

<u>Arakas</u>, 983 F.3d at 100 (internal quotation marks and citations omitted). In view of the other errors, described above and below, affecting the ALJ's RFC determination, the ALJ's error in overstating Plaintiff's daily activities provides an additional ground for remand.

### 5. Non-Medical Evidence

Plaintiff's final assignment of error maintains that "[t]he ALJ failed to give proper consideration to non-medical evidence in the record." (Docket Entry 14 at 21 (bold font, capitalization,

53

and single-spacing omitted); see also Docket Entry 19 at 10-11.)
More specifically, Plaintiff faults the ALJ for failing to consider
Plaintiff's "almost-daily log of symptoms" from December 2016 to
September 2018 which "demonstrated [her] struggles with profound
fatigue and pain" and "show[ed] that [she] ha[d] very few good days
during which she c[ould] sustain normal activity even at the
sedentary level." (Docket Entry 14 at 22 (citing Tr. 492-523).)
Plaintiff additionally objects to the ALJ's rationale for
discounting third-party statements from Plaintiff's friends, Beth
A. Holley and Deborah Makemson, and fashion clients Kimberly Scholl
and Julia M. O'Carroll. (See Docket Entry 14 at 23-24 (citing Tr.
423-30, 559, 566-70).) In Plaintiff's view, the ALJ "treated
th[ose statements] as opinion evidence, yet she failed to comply
with 20 [C.F.R. §] 404.1527(f) and discuss the evidence in a way
that would allow subsequent reviewers to follow her reasoning."
(Id. at 24 (citing Tr. 25).) Plaintiff's arguments demonstrate
additional, prejudicial errors by the ALJ.

An ALJ may consider evidence from non-medical sources, such as
statements from spouses, parents, caregivers, siblings, other
relatives, friends, neighbors, and clergy, to determine the
severity of a claimant's impairments and her residual ability to
work, see 20 C.F.R. § 404.1513(d)(4); see also Social Security
Ruling 06-03p, Titles II and XVI: Considering Opinions and Other
Evidence from Sources Who Are Not "Acceptable Medical Sources" in

54

Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("SSR 06-03p"). "[I]nformation from [non-medical sources] may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function[;]" however, in considering evidence from these sources, "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06-03p, 2006 WL 2329939, at *2, *6. Moreover:

> The [ALJ] generally should explain the weight given to opinions from [non-medical] sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ]'s reasoning, <u>when such opinions may have an effect on the outcome of the case</u>.

20 C.F.R. § 404.1527(f)(2) (emphasis added).

As the Commissioner concedes, "the ALJ should have addressed [Plaintiff's symptom log as] non-medical evidence under 20 C.F.R. § 404.1527(f)(1)-(2)." (Docket Entry 17 at 19.) Moreover, given the other infirmities in the ALJ's RFC analysis discussed above and requiring remand, the Court should not deem the ALJ's error harmless because consideration of the symptom log upon remand could "have an effect on the outcome of the case," 20 C.F.R. § 404.1527(f)(2).

55

With regard to the third-party statements, the ALJ provided the following discussion:

> In considering evidence from non-medical sources, including third-party function reports, the [ALJ] will consider factors such as (1) the nature and extent of the relationship between [Plaintiff] and the non-medical source[,] (2) whether the evidence is consistent with other evidence[,] and[] (3) other factors that tend to support or refute the source's statements. In the case of reports from friends or family members, the fact that such persons often have the opportunity for frequent observation of a claimant's daily activities must be balanced against the likelihood that such persons are often very sympathetic to a claimant and his or her allegations of pain or other disabling condition. In this case, the [ALJ] gives less weight to the third party function report and statements submitted by [Plaintiff]'s friends and clients, as they are <u>not consistent with the objective findings of [Plaintiff]'s treating physicians in the medical evidence of record</u>.

(Tr. 25 (emphasis added).) That analysis does not suffice because 1) the ALJ identified neither the "objective findings" nor the "treating physicians" whose findings conflicted with the third-party statements (<u>see</u> <u>id.</u>), 2) as discussed above, the treatment notes of Dr. Klein and Nurse Kooistra do not contain many objective findings and consist primarily of Plaintiff's subjective symptom reporting and prescribed treatment (<u>see</u> Tr. 606-71, 677-708, 912-84, 1002-05), and 3) the ALJ's discussion of the treatment records from Dr. Klein and Nurse Kooistra contained generalized observations that did not accurately capture the content of those records and glossed over significant evidence supporting Plaintiff's subjective complaints (<u>see</u> Tr. 20-23).

56

In short, the ALJ's failure to consider Plaintiff's symptom log and insufficient evaluation of the third-party statements constitutes an additional basis for remand.

### III.  CONCLUSION

Plaintiff has established errors warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated, and that this matter be remanded under sentence four of 42 U.S.C. 405(g) for further administrative proceedings, including re-evaluation of 1) the medical opinions of the state agency medical consultants, Dr. Klein, and Nurse Kooistra, 2) Plaintiff's subjective reports of fibromyalgia symptoms in compliance with <u>Arakas</u>, 3) Plaintiff's daily activities, and 4) Plaintiff's symptom log and the third-party statements of Beth Holley, Deborah Makemson, Kimberly Scholl, and Julia O'Carroll.  As a result, Plaintiff's Motion for a Judgment Reversing or Modifying the Decision of the Commissioner of Social Security, or Remanding the Case for a Rehearing (Docket Entry 13) should be granted, and Defendant's Motion for Judgment on the Pleadings (Docket Entry 16) should be denied.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

August 19, 2022

57